UNITED STATES of America,
Plaintiff-Appellee,

v.

John Edward DAY, Defendant-Appellant.

No. 15551.

United States Court of Appeals
Sixth Circuit.

June 24, 1964.

Russell W. Renner (Court Appointed), Cincinnati, Ohio, for appellant.

David E. Smith, Asst. U. S. Atty., Knoxville, Tenn., J. H. Reddy, U. S. Atty., Chattanooga, Tenn., on brief, for appellee.

Before WEICK, Chief Judge, CECIL, Circuit Judge, and McALLISTER, Senior Circuit Judge.

PER CURIAM.

John Edward Day appeals from an order of the District Court denying his motion to vacate sentence filed under Title 28 U.S.C. § 2255. Day pleaded guilty to a two-count indictment charging him with bank robbery, and received sentences of five years, and twenty-five years, to be served concurrently.

Among the errors charged in his motion to vacate, appellant Day contended that, at the time of sentence, he was incapable of assisting in his defense. It appears that on the day following the bank robbery, appellant was brought before the Court on his request; that the Court appointed counsel to represent him; that appellant stated to the Court that he had been drinking whiskey for about ten days before the robbery and taking pills, presumably barbiturates with the whiskey; and that he had been arrested seventy-five times for drinking.[1]

1. "Alcoholic Insanity. Alcoholism can lead to several forms of insanity, the chief of which are Delirium Tremens, Korsakow's Psychosis and Alcoholic Dementia. * * *

He was thirty-three years old. When the agents of the Federal Bureau of Investigation arrested appellant shortly after the bank robbery, he was "quite intoxicated," and after questioning appellant for about five minutes, the agents discontinued it because of his intoxicated state. The District Court asked appellant whether he wished to be referred to the mental institution in Middle Tennessee, "to be examined for sanity or insanity." Appellant replied: "I do have troubles, problems. If they could help me I would like to go there."

In reply to a further question of the Court, appellant said that he felt that there was something wrong with his mind—that he thought he must be mentally sick. He said that every time he drank, he got mixed up, and was drinking when he entered the bank. He stated that when he was not drinking, the record would show he never got into trouble. The Court observed that be-

"Alcoholic Dementia. This develops in a certain number of individuals who habitually drink to excess. There is progressive deterioration of mind and body. Memory becomes greatly impaired, moral sense is lost and self-control is greatly diminished. The person becomes heedless of his appearance, his work and his responsibilities. Delusions and morbid suspicions are common. * * *

"It is difficult to say just how many cases of insanity are caused by alcohol and alcohol alone. Alcoholism is often associated with mental disorder, and may be the precipitating cause of an attack, but the real origin is elsewhere. * * * Alcoholism is a frequent concomitant of mental instability and mental disorder. It has been held by some that alcoholism is really the result of a disordered mind. This is an overstatement of a partial truth for it is undeniable that the persistent abuse of alcohol can of itself, in normal and stable persons, cause a deterioration of mind and character." Mental Abnormality and Crime, edited by L. Radzinowicz and J. W. C. Turner, for Department of Criminal Science, Faculty of Law, University of Cambridge, England, 1944, pp. 169, 170, 171, 175.

Insanity, whether produced by drunkenness or alcoholism, or otherwise, is a defense to the crime charged. While the issue in this case is whether appellant's continuous and excessive drinking and simultaneous dosage of barbiturates resulted in his mental condition becoming deteriorated to a point where he was not legally responsible for the commission of unlawful acts, it appears that appellant's drinking habits and resultant arrests are identical to those mentioned in studies of men on "skid row," who today, are not mainly drifters, but are state and local residents. An enormous expenditure is devoted to what would appear to reasonable people to be a most foolish policy in which "public funds are spent in a dreary business of arresting chronic alcoholic men, detaining them overnight in order to turn them loose again on the streets the next day, so that they may be re-arrested, re-detained and re-released, so that they may be re-arrested, etc. This serves only two useful functions—(1) to protect the drunken man from exposure to the elements, and (2) to cull out the ones who are too weak, too sick, or too mentally deteriorated to be 'turned back to pasture' for another day in the taverns. It does nothing to help any man to stop drinking." Federal Probation, Vol. XXV, No. 2 (June 1961), p. 42, quoting from The Homeless Man on Skid Row, by Donald J. Bogue and June W. Schusky. A research Report on Housing and Home Finance Agency Demonstration Project. Number 111, D–1. Chicago: Tenants Relocation Bureau, July 1958.

Attorney General Kelso Roberts of Ontario in September 1959 declared that the Liquor Control Act of that province should be changed to eliminate 3-month jail sentences for "harmless skidrow drunks," and stated that he would recommend government action to amend the Act to eliminate the sentences. The Attorney General stated that punitive jail sentences were not doing any more than adding to the expense of the taxpayer in detaining these people and that a program of rehabilitative treatment rather than jail sentences was the answer to the problem. Federal Probation, Vol. XXIII, No. 4 (December 1959), p. 76.

From an analysis of a Seattle Police Department Rehabilitation Project for chronic alcoholics, "it is apparent that a rehabilitation facility can cut down the arrest rate of chronically arrested alcoholics, at least for the 6 months following release. Aside from the benefits to individual alcoholics from such a project, the financial savings to the city are tremendous." Federal Probation, Vol. XXII, No. 2 (June 1958), pages 36, 40.

cause a man gets into trouble when he drinks is not a good reason for sending him to an institution for a mental examination, but that if he was insane—if there was any question about it, he should be referred for such an examination. Counsel for appellant, after discussing the matter with the Judge in open court, said: "How are we to know at any time now or a week from now what effect this week's drinking had on [him] and what is [his] mental status unless we have somebody who is experienced in that field to observe [him] or investigate [him] and to make the report?" To this the District Judge replied: "If you want me to I can have [him] examined before sentence is pronounced, if you want me to." Counsel replied: "I don't know what an examination may disclose. It appears to me that this is a case that needs some more investigation, and the only place where there is security, as I understand, to make these investigations is over at midstate."

\* \* \*

"The Court: You want me to refer it? I can't refer it unless [he requests] it, or I wouldn't. You want me to refer it to Mr. Swafford here, his department, and have him go into it?

"Counsel for Appellant: And make a full report before we proceed further?

"The Court: \* \* \* All right, Mr. Swafford, if you have any doubt about me sending [him] to Nashville for a mental examination, I will send [him].

"Counsel for Appellant: We will abide by his decision.

"The Court: But make a thorough investigation. I don't mean about the guilt or innocence, anything like that, but a thorough investigation of [his] background and of [his] mental facilities."

Mr. Swafford was the Chief Probation Officer. The report of the Probation Officer thereafter submitted stated that "there wasn't any question about Day being sane either at the time of the robbery or at the time the investigation was made." Thereafter, appellant Day was arraigned, pleaded guilty, and was sentenced.

We are of the view that under the circumstances mentioned, the examination by the Chief Probation Officer as to appellant's mental competency was not sufficient. Appellant should have been given an examination by an expert psychiatrist. Day's mental competency was, obviously, under suspicion by the trial judge. The District Court, as above mentioned, asked appellant whether he wanted to be examined as to his sanity at the mental institution provided in such cases. The Court further advised appellant's counsel that if he desired, the Court could have Day examined before the sentence was pronounced. In finally referring the matter to the Chief Probation Officer, the Court asked him to report about the advisability of sending appellant to Nashville for a mental examination and to make a thorough investigation about his mental condition.

In United States v. Walker, 301 F.2d 211, 215, (C.A.6), it was held that the issue of whether a defendant was entitled to a pretrial psychiatric examination could be considered on a motion to vacate sentence. "The legislative history of Section 4244 [Title 18 U.S.C.A.] indicates the intent of Congress to provide for a psychiatric examination whenever the mental competency of the accused came 'under suspicion.' \* \* \* It is our opinion that there was enough here to cause the court to suspect that [appellant] might be mentally unfit to stand trial." In Krupnick v. United States, 264 F.2d 213 (C.A.8, 1959), it was held that the District Judge erred in having an accused examined by a general physician where circumstances called for psychiatric evaluation. An investigation or an examination by the Chief Probation Officer, or the Probation Department, is, in no way, a substitute for a psychiatric examination. While there was no motion, orally or in writing, requesting a psychiatric exam-

ination, there was, under the circumstances, no necessity for such a motion. The appellant's mental condition had been brought to the attention of the Court in such a way as to create a suspicion, and to require the prescribed examination.

■ Where the District Judge does not order a pretrial psychiatric examination of the accused as required by statute, the Court of Appeals, on motion to vacate the sentence, remands with directions that the District Court order the psychiatric examination to determine whether accused at the time of trial was mentally competent to stand trial; and, if the Court determines that the accused was not mentally competent, sentence should be vacated and a new trial ordered, but otherwise the sentence should stand. United States v. Walker, supra, 301 F.2d, at 215.

In accordance with the foregoing, without vacating the sentence, the case is remanded to the District Court for further proceedings not inconsistent with this opinion.