UNITED STATES of America,
Plaintiff-Appellee,

v.

John Edward DAY, Defendant-Appellant.
No. 15551.

United States Court of Appeals
Sixth Circuit.

Nov. 19, 1965.

Russell Renner (court appointed), Cincinnati, Ohio, for appellant.

John H. Reddy, U. S. Atty., Knoxville, Tenn., for appellee.

Before WEICK, Chief Judge, CECIL, Circuit Judge, and McALLISTER, Senior Circuit Judge.

McALLISTER, Senior Circuit Judge.

On a prior appeal from an order of the district court denying appellant's motion to vacate sentence, this case was, without vacating the sentence, remanded to the district court for an order directing a psychiatric examination of appellant to determine whether, at the time of his trial, he was mentally competent to stand trial. United States v. Day, 333 F.2d 565, 566 (C.A. 6). Appellant has since been given a psychiatric examination, and thereafter was found competent. He now files before us a "Motion for Rehearing on Unruled Issues."

Before discussing appellant's motion, a recital of the background of the case is helpful. The facts giving rise to the order of remand are as follows: Appellant, after holding up a national bank at Greenback, Tennessee, with two other men, and securing $54,000 in cash, was arrested within thirty minutes of the holdup. At the time, the agents of the Federal Bureau of Investigation attempted to find out something about the affair from him but, after five minutes, discontinued their questioning because appellant was so intoxicated, his answers made no sense. It appeared that during ten days before the holdup, he had been taking excessive doses of barbiturates and continually drinking whiskey. He had previously been arrested for drunkenness seventy-five times.

On the remand of this case for a psychiatric examination, the district court directed that appellant be examined at the United States Medical Center for Federal Prisoners, at Springfield, Missouri.

The Psychological Report made by the Clinical Psychologist, Robert J. Murney, states, among other matters, that, according to appellant Day's history, he was born and reared in an economically-depressed mining region in Kentucky. He described his childhood vaguely as having been happy. He left school at the end of the eighth grade, worked for an electrical company, and joined the Marines at the age of sixteen. After a two-year enlistment, he was honorably discharged, and returned home to work in the coal mines. The report of Dr. Murney goes on to say that Mr. Day then became involved in a mine accident which resulted in injury to his hands and a residual dependence upon barbiturates.

"Since the time of that accident he had worked, primarily, as a roofer, but his excessive drinking and dependence upon barbiturates have interfered seriously with his ability to establish a stable adjustment. * * * Mr. Day is a poorly educated man from a deprived socio-economic and cultural background. * * * In response to the Cornell Index, he complains of headaches, fainting spells, dizziness, feelings of hopelessness and despair, symptoms referrable to the cardio-vascular system, fatigue, exhaustion, etc. * * In brief, Mr. Day does appear to be highly anxious, depressed and somatically preoccupied, but is functioning in an essentially non-psychotic level.

"The personality picture emerging from the projective tests is that of an * * * emotionally impoverished man who has probably always been schizoid. In fact, his performance on the Rorschach [tests] is so impaired that I would not quarrel with a schizophrenic label being applied; but, in the absence of more definite primary and secondary symptoms I think the term, schizoid, is more applicable.

"Finally, the results of the Graham-Kendall Memory for Designs Test show minimal visual-motor impairment suggestive of an early organic brain involvement. In view of the history of alcoholism, this possibility should be considered.

"In summary, our findings do show that Mr. Day is currently, anxious, depressed and emotionally withdrawn but not actively psychotic. He shows every sign of suffering from a longstanding emotional disorder and is basically a schizoid personality.

"PSYCHODIAGNOSTIC IMPRESSION:

1. Schizoid personality, with alcoholism and barbiturate addiction.

2. Schizophrenic reaction, chronic, undifferentiated type, in remission."

The Staff Psychiatrist at the Medical Center, David A. Rothstein, M. D., filed a report in which, among other matters, he outlined appellant's history as follows:

"PAST HISTORY: With respect to beginning taking drugs, the patient said he had lost two fingers in the coal mines in the past. He said it was delayed two months before one was removed and so he started getting 'red devil and yellow jacket' for the pain. The fingers involved are the index and middle fingers of the right hand. In addition to the medication the patient said he was also taking whiskey along with it for the pain. He said the medication he is referring to is some kind of barbiturate. He said this was in about 1948–49 and he just stayed on it. He said he is not taking any medication now. He said he doesn't really believe that people are talking about him but he does often feel that someone is staring or talking. He said he once had a hallucination before he was locked up. He said at that time he had an argument with his sister-in-law and later that evening he thought he heard her say she was going to poison him. He said she didn't really say this. This was around October or November of 1962. He said he has never had any other hallucinations. He said he had never had a 'nervous breakdown.'

He said he did, however, almost go into 'DTs' a few times. He remembers in Chicago he was drinking and bought two dozen benzedrine and blacked out for two days. He awoke in a skid row flop house and got himself a drink. * * *

"The patient described that he had a 'happy childhood.' * * * His father lived in a mining camp and * * * still is a miner. The mother and father are still living. * * * The father did not allow her to work. * * * He said, 'dad never struck mother,' in explanation of in what way their marriage was 'OK.' * * He went into the Marine Corps about 1946 and was in for almost two years. He said he was in China for 15 months. * * * After the service he worked in the coal mines. He said one of the cars ran over his hand in about October of 1948. * * * It is noted that we do have two letters which were sent to me; one was sent by Mrs. Hiram Day, Box 53, Lynch, Ky. She states 'Dear Sir: In behalf of my son, John Ed, I would like for you to know and understand his weakness. John hasn't been himself in a few years. At the beginning of his sickness he had a mine accident which he lost a finger and the doctor gave him barbiturates for ease and sleep and got him on this terrible dope and I do believe has caused him this mental illness, just a few months or weeks before he was sentenced this last time he was working for a roofing company and he come home from work at night not even knowing when he got home. Do things he wouldn't know what he was doing; would raise fights jump on his brothers and he had asked me and his daddy different times to have something done with him. So I do hope he can be treated and something done for him so he can be well and be a citizen. I can't begin to tell the things he has done under the in-

fluence of this dope and alcohol. We were all afraid of him. He'd act so peculiar and queer. John Ed is a hard worker and was a fine person out of dope and whiskey so I'm asking you to please try and have him treated and something done for him."

The report of the neuro-psychiatric staff examination at the Medical Center states:

"It was * * * the opinion of the Staff that the diagnosis of schizoid personality with alcoholism and barbiturate addiction is the appropriate diagnosis and there is not any evidence to indicate that the patient was acutely psychotic at the time of the offense, arraignment or trial. The only problem remaining is that of acute alcoholic and barbiturate intoxication. It is entirely possible that at the time of the offense and at the time of proceedings on waiver of indictment on December 28, 1962, the patient could have been intoxicated however, the transcript of the proceedings on waiver of indictment December 28, 1962 seem to give indication that the patient at that time was able to understand the charges against him and to assist counsel in his defense so that at that time he was not apparently intoxicated enough to render him incompetent."

In the report of the neuro-psychiatric staff examination, it was further stated:

"It was considered that there might be minimal evidence of early organic brain involvement on the basis of the history of alcoholism. In the light of this the Psychologist was requested specifically to amplify upon whether the test findings could support organic changes severe enough to be consistent with a concept of insanity on the basis of these organic changes. The Psychologist has indicated that the organic findings are not of sufficient degree to be considered a true organic brain syndrome."

However, the report of the psychologist actually did state that the results of the Graham-Kendall test showed "minimal visual-motor *impairment suggestive of an early brain involvement.* In view of the history of alcoholism, this possibility should be considered." (Emphasis supplied.)

The conclusion of the neuro-psychiatric staff, however, was as follows:

"Based upon all of the above it was the opinion of the Psychiatric Staff that the patient is presently competent, was competent on the date of arraignment and trial (competent in the sense of having the capacity to understand the charges against him and to assist counsel in his defense) and that there is insufficient evidence to support a contention that he was legally insane at the time of the offense."

In considering the above medical report from the Medical Center, the district court on the hearing stated that counsel for Mr. Day declared that they were not willing that

"this issue before the Court * * * be decided solely on the medical report received by the Court and that they would insist, and did insist, that a representative of the Medical Center at Springfield, Missouri, appear here in person in order that they might be afforded the right to cross-examine him.

"Accordingly, the Court directed the United States Attorney to communicate with the doctors at Springfield and request that one of them appear here and testify in this proceeding. Dr. David A. Rothstein, a psychiatrist, has appeared and testified in detail with respect to the mental faculties of petitioner as of the date of the trial and as of the date he was arraigned. The doctor has been thoroughly cross-examined by the attorneys for the petitioner.

"It is the opinion of Dr. Rothstein that petitioner was competent to know what he was doing at the time

he was arraigned and pleaded, and it is likewise his opinion that petitioner was competent to know right from wrong at the time he, along with his confederates, committed the offense which is the subject of this litigation.

"The representatives of the Federal Bureau of Investigation, Mr. James L. McGovern and Mr. Nelms Johnson, talked to the petitioner on December 27, with Mr. McGovern beginning the conversation at 1:47 p. m., about 50 minutes to an hour after the crime was committed.

"Mr. McGovern stated that the petitioner was under the influence of whiskey at that time but not to the extent that he did not know what he was doing. Mr. Johnson and Mr. McGovern found one thousand dollars hidden in the petitioner's shirt sleeve cuff."

However, in the proceeding on Waiver of Indictment, the day after the robbery was committed, Mr. McGovern, the agent of the Federal Bureau of Investigation, was interrogated by the court as follows:

"THE COURT: Mr. McGovern, did you handle these cases?

MR. McGOVERN (FBI Agent): Yes, your Honor.

THE COURT: Have you seen anything in these boys to indicate that they might be off?

MR. McGOVERN: No, sir.

THE COURT: Have you seen anything that you think might be require a mental examination?

MR. McGOVERN: Frankly, I haven't. Mr. Day and also Mr. Balleu, the other defendant here, appeared to be very lucid during the time that we interviewed them.

It is true when we first talked to Day here that he was quite intoxicated.

THE COURT: He was.

MR. McGOVERN: He was intoxicated at that time. And our interview consisted of about five minutes

of conversation and we discontinued it.

Balleu here, however, he was lucid during the entire interview, and this was shortly after the events took place at Greenback, and there were indications that he had been drinking. You could smell it. However, he was very normal, very rational."

The foregoing points rather persuasively to the fact that Mr. Day was so intoxicated when he was interviewed by the FBI agents that they decided to discontinue any talk with him after five minutes of conversation; while Mr. Balleu, a co-defendant in the robbery, was, on the other hand, lucid, normal, and rational during the entire interview in spite of the fact that he had been drinking.

We required the transcription of the testimony of Dr. Rothstein and have had it before us for examination.

The trial court, after referring to the opinion of Dr. Rothstein, and commenting upon the finding of the thousand dollars on the person of Mr. Day by the agents of the FBI, stated:

"A person who has the mental faculty to plan a robbery of this kind which he explained in detail to Messrs. McGovern and Johnson, and has the capacity to execute that robbery along with his confederates, and has the capacity to explain in minute detail on the day following the robbery how it occurred and how it was planned, a man having the mental faculty to take a thousand dollars as fruits of the robbery and to conceal it in the cuff of his shirt in order to get it for himself, certainly would know right from wrong."

The court then found appellant mentally competent as follows:

"In the opinion of the Court, and the Court finds from the record as a whole and from the testimony of Dr. Rothstein, that petitioner was mentally competent and able to understand the nature of the proceed-

ing against him and to cooperate with his counsel in his defense at all stages of the criminal proceeding and particularly on the day that he was arraigned and pleaded; that petitioner was likewise mentally competent to know right from wrong at the time he, along with his confederates, committed the offense."

A court may be often troubled about the mental responsibility of a man to commit a crime, such as in his case where, at the age of thirty-two, appellant has had such a chaotic life of mental distraction, from the use of drugs and alcohol, first used by him on a doctor's direction to escape the pain of severed fingers, resulting from an industrial accident.

However, in this case, the district court found from the evidence that appellant was sane at the time of the commission of the offense, as well as at his arraignment and at his trial; and although appellant appears in propria persona, he does not appeal from his decision; and there is nothing before us on the sanity issue for our determination. We have given consideration to the question only because the case was remanded to the district court for an order directing that a psychiatric examination be held and that the court file findings on the question of appellant's sanity.

The other issues on the appeal were not heretofore passed upon by this court, since, if there had been a finding that appellant was not competent at the time the offense was committed or was not competent to stand trial, such finding would have made the other issues moot.

Appellant, therefore, now submits that, while the court heretofore remanded the case for the psychiatric examination in question, and that such examination has since taken place and appellant has been found to have been mentally competent at the time of his trial, he had also submitted other issues on this appeal, which, because of the remand for psychiatric examination, this court did not pass upon; and appellant's application now before us is designated by him as a

"Motion for Rehearing on the Unruled Issues."

■ The remedy sought does not require a motion for a rehearing; it is necessary only to call the attention of this court to the fact that there are issues still in abeyance, which were not determined in its prior order; and there is no question that there is at least one issue on the appeal that we have not determined. Appellant, quite properly, informs us of the fact that the court has not yet passed upon these issues, and we accept appellant's "Motion for Rehearing on Unruled Issues," as advice to this court of the remaining issues before us for determination.

The issues now remaining before us from the prior appeal filed are alleged by appellant to be the following: 1) that appellant was denied effective assistance of counsel; and 2) that he was coerced into a plea of guilty.

The trial court appointed as counsel for appellant for the trial of his case, Mr. Horace Atkins, described by the court as one of the most experienced attorneys in criminal law at the Knoxville Bar. While appellant states that he consulted with him only a brief time before his trial, it appears that in the proceedings on Waiver of the Indictment, Mr. Atkins appeared on behalf of appellant. He stated, in open court, that he had talked to appellant; and he carried on a considerable discussion with the District Judge, and persuaded the judge to have the Chief Probation Officer of the district court carry on an investigation and examination as to appellant's mental condition. It appears clearly that Mr. Atkins consulted with appellant, and that he knew all of the circumstances surrounding the commission of the offense, as well as the matters bearing upon appellant's responsibility for his acts. During the discussion in open court between appellant, Mr. Atkins, and the District Judge, appellant, when questioned as to whether he wanted to waive the action of a grand jury and be tried on information, stated to the court, without being asked, that he was guilty. The court, however, said

that that statement would not be held against him. Subsequently, on arraignment, after the Chief Probation Officer had made his report to the court, appellant pleaded guilty, and was sentenced to imprisonment for a period of twenty-five years.

An examination of the record discloses that Mr. Atkins, confronted by a case in which the commission of the crime charged against appellant was clear and unquestionable, except as to appellant's responsibility for his acts, rendered the proper legal assistance in protecting his rights. From the transcript it appears that Mr. Atkins was deeply concerned with the plight of appellant. His discussion with the trial judge in open court with regard to the matter involved, indicated his anxiety for the preservation of all the rights the accused might have, and his awareness of the only real defense, in spite of the conceded action of appellant in robbing the bank. From everything that appears in the record, it is our conclusion that there is no substance to the claim that appellant was denied the effective assistance of counsel. He has not attempted to show in what manner counsel failed to assist him, or how any such failure would constitute "ineffective assistance of counsel" in violation of the Sixth Amendment. Mitchell v. United States, 104 U.S.App.D.C. 57, 259 F.2d 787. Moreover, there is nothing in the record or in any of the briefs filed before remand, or on the hearing of this "motion" that points out or indicates any coercion practiced upon appellant to induce him to plead guilty; and in no place does he deny committing the act for which he was sentenced.

The present motion before us, entitled a "Motion for Rehearing on Unruled Issues," and which we here consider as a notice calling attention of this court to issues still in abeyance and not determined by our prior order, mentions no other than the issues we have here passed upon.

In accordance with the foregoing, it is our conclusion that appellant was not denied the effective assistance of counsel, and that he was not coerced into entering a plea of guilty.

The order of the district court denying petitioner's motion to vacate sentence is affirmed.