**UNITED STATES of America,**
**Appellee,**

v.

**Lacount Aaron BLY, Appellant.**

**No. 72–1008.**

United States Court of Appeals,
Eighth Circuit.

Submitted June 16, 1972.

Decided Aug. 2, 1972.

**1236**

James M. Reed, Jr., Kansas City, Mo., for appellant.

William A. Kitchen, Asst. U. S. Atty., Kansas City, Mo., Bert C. Hurn, U. S. Atty., Kansas City, Mo., for appellee.

Before MATTHES, Chief Judge, ROSS, Circuit Judge, and URBOM,* Chief District Judge.

URBOM, Chief District Judge.

In a trial to the court without a jury the appellant, Lacount Aaron Bly, was convicted of bank robbery in violation of 18 U.S.C. § 2113(d) and thereafter was sentenced to imprisonment for 25 years. Bly's defense was that he was insane at the time of the offense.

Two independent grounds are urged for reversal on appeal. The first is that the trial court unduly restricted the scope of cross-examination of a government witness; the second is that the evidence was insufficient to establish beyond a reasonable doubt that the appellant at the time of the offense had the requisite mental responsibility to be held accountable. Implicit within the second ground is the urging that a change in the standard of insanity to be applied in this circuit, made since the trial of this case, requires a retrial employing the new standard. We reject both contentions.

Uncontradicted evidence establishes the following events: On July 9, 1971, Bly, with two confederates, drove in a stolen automobile to the Bank of Riverside in Riverside, Missouri. Bly and one of his companions entered the bank, leaving the third man in the automobile monitoring a radio tuned to police frequencies. Both men who entered the bank were armed with guns and wore face masks. Bly wore a pair of coveralls over his street clothes. In the course of the robbery Bly ordered bank personnel to "get down" and ordered the bank president into the vault, where he demanded "the big money." When told that it was impossible to enter beyond a certain gate within the large vault, Bly struck the bank president with a gun and at some point in time kicked him. Upon taking a total of $6,317.00 from the tellers' windows, the robbers fled. An alarm had been sounded by the bank president and police arrived at the scene before Bly reached the getaway car. Bly ran to a wooded area near the bank, was shot at by a police officer, shed his

---

* Of the District of Nebraska, sitting by designation.

coveralls, and was apprehended in the water of a small stream. During his arrest Bly was slightly wounded by a blast from a shotgun and was taken to the North Kansas City Memorial Hospital in the custody of James F. Glonek, a special agent of the Federal Bureau of Investigation. Bly's two confederates were convicted on pleas of guilty.

## I.

One of the witnesses called by the government was Michael Haygood, who, prior to the appellant's trial, had pleaded guilty to the bank robbery but had not been sentenced. His testimony was that he, Haygood, had been the participant who waited in the car outside the bank for Bly and Marshall, the other accomplice, to return. He positively identified Bly as being at the bank at the time of the robbery.

During cross-examination, defense counsel questioned Haygood at length about his motives for testifying as he did. Six questions on the subject were intercepted by sustained objections; over thirty were answered without objection. Included within the answered questions to which no objection was made were: "Why are you here testifying today?"; "I am asking you why are you here testifying today?"; "They forced you to come in to testify?"; "You are here voluntarily?"; "Why did you volunteer to come in?"; "Isn't it a fact you are testifying because you want to help your situation now because some promises have been made to you?"; "Nothing's been said to you with regard to, Well, we will try to get you a lower sentence?"; "All of a sudden you have come from being an individual who tags along and robs banks to an individual who wants to come forward and testify against another man, to see that the truth comes out and that justice triumphs, is that right?"; "Why are you are here testifying?"; "And no promises have been made to you?"; "And why would you want the Court to think that you want to do right?"; "And you are trying to show now that you are co-operative?"; "To which extent would you be willing to go to impress the Judge that you are willing to do right now?"; and "Well, would you like to impress upon the Judge your intentions to do right now?"

The questions to which objections were sustained were: "And why are you telling the truth?"; "You are here testifying voluntarily. That's cooperation, isn't it?"; "What is your definition of 'cooperation'?"; "Isn't it true that you, at this stage of the game, after being in jail for four months, you would say virtually anything to impress the Judge that you are going to do right now?"; "A few minutes ago you said you were trying to impress the Judge. Am I mistaken?"; and "To what extent would you be willing to go?"

■■ The prohibited inquiries were merely repetitious or cumulative, the subject having been explored fully and at length without objection. While it is vital that a searching cross-examination be permitted where the credibility of an important witness is being challenged, Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), there was no abuse of discretion here in the sustaining of the objections. The witness had testified in response to questions by the cross-examiner that no promises whatsoever had been made to him, that he was testifying because he had pleaded guilty, that he "would like the Court to think I am wanting to do right" because he had been locked up in jail for the preceding four months and because he had admitted his guilt, that he was not trying to show that he was being cooperative, and that he was not trying to impress anyone. The right of cross-examination having been substantially and thoroughly exercised, the allowance of further cross-examination became discretionary with the trial court. Touhy v. United States, 88 F.2d 930 (8th Cir. 1937); Bass v. United States, 326 F.2d 884 (8th Cir. 1964); United States v. Migliorino, 238 F.2d 7 (3rd Cir. 1956). Cf. United States v. Dickens, 417 F.2d 958 (8th Cir. 1969).

## II.

At the trial the defense elicited expert testimony from Dr. Stanton L. Rosenberg, who is psychiatrist on the staff of Menorah Hospital in Kansas City and is an associate clinical professor at the University of Kansas Medical Center. In rebuttal the prosecution presented the testimony of Dr. Harold B. Fain, deputy chief of psychiatry at the Federal Medical Center, Springfield, Missouri, testimony of Dr. Judith Tharp of the North Kansas City Memorial Hospital, and lay testimony of special agent Glonek.

Undoubtedly, both counsel and the trial judge had in mind the standard of insanity reaffirmed by this circuit in Pope v. United States, 372 F.2d 710 (8th Cir. 1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968). That standard was the M'Naghten-irresistible impulse rule, focusing on the elements of the defendant's cognition, volition, and capacity to control his behavior. After the trial of the present case this court in United States v. Frazier, 458 F.2d 911 (1972), held that, for defendants whose convictions were not then final, the American Law Institute rule would govern, as follows:

"(1) A defendant is insane within the meaning of these instructions if, at the time of the alleged criminal conduct, as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this Article, the terms 'mental disease or defect' do not include any abnormality manifested only by repeated criminal or otherwise anti-social conduct."

Under the circumstances of this case we conclude that further proceedings in the trial court are not required.

Although many of the questions to the witnesses on the subject of mental competency were put in terms of the M'Naghten-irresistible impulse test, the answers were not so restricted and often fell within the broader ambit of the ALI standard.

Essentially, Dr. Rosenberg, the defense psychiatrist, testified as follows: His opinions were based upon a social history prepared by Dr. Drown and interviews of the appellant of about three hours in length. The appellant was competent to stand trial because he had no severe organic disease impairing brain function, was not extraordinarily mentally defective, and had no severe, disruptive psychiatric disorder from which he was completely out of control. An I.Q. test of several years ago showed the appellant's I.Q. to be 87 or 89, below normal. In Dr. Rosenberg's opinion the appellant at the time of the crime, July 9, 1971, did not have the discriminatory capacity to understand fully the consequences and significance of his criminal behavior, because of his low normal or below normal intellectual capacity. He did have a willfulness to commit the criminal act, but the appellant's reasons for doing the act are uncertain, although Dr. Rosenberg speculated that the appellant was lashing out in rage and violence against authority figures and, as one who detested himself, was showing others that he was "a kind of bad fellow." Bly had an emotional illness which is hard to define and had a primitive conscience which recognized that he should not commit criminal acts but let him do them while warning him that he would get into trouble. These factors and a long history of past offenses indicate an inability to perform in accordance with societal norms. Bly lacked the integrative process which enabled him to function smoothly with society or himself.

Dr. Rosenberg emphasized that the appellant's "long history of antisocial behavior is a clear statement as to what's wrong with the guy." Bly's approaching the president of the bank with a gun, threatening him with a gun, making him lie down and kicking him were not normal conduct and were a reflection of a "kind of lifelong history of inability to control himself." Indeed, Dr. Rosenberg testified that to form an

opinion he did not need information from Bly regarding Bly's early experiences, his periods of depression, his self-destructive urges, and his violence and rage, because he, Dr. Rosenberg, could base the same conclusions on Bly's long criminal history. At one point the trial court interposed:

"THE COURT: I believe you said any person who does have a long history of law violation you would consider insane, as you have defined it here, incapable of conforming to the law.

Do I understand that's your answer?

"THE WITNESS: Yes sir."

In response to questions on cross-examinations about Bly's wearing a mask, wearing coveralls over street clothes, taking off the coveralls while being chased, and using a stolen car for a getaway car, Dr. Rosenberg concluded that "no bank robber is smart" and that one of the implications of his testimony was that "They wouldn't be a bank robber if they could conform . . .", which is true of "just about any criminal." Bly was able, said Dr. Rosenberg, to think out clearly an antisocial bit of behavior, and he would not have thought it out if he had not been mentally ill. Dr. Rosenberg said that his views "might well" be of a minority viewpoint within the psychiatric profession. He further stated that an assumption that the appellant knew the difference between right and wrong would make no difference in the doctor's opinion "as to his ability to conform his conduct to the requirements of the law," which is that "this guy has little capacity for conforming to what society expects as normal behavior." He ended his testimony by saying that he did not know the extent of the appellant's knowledge of right and wrong, but speculated that Bly knew that robbing a bank would be a violation of the law.

■ From the entire record of Dr. Rosenberg's testimony, which comprised sixty-five pages of the transcript, we think there was sufficient evidence un-der the ALI test to raise the issue of insanity. In that posture the proof of sanity beyond a reasonable doubt was at equipoise and the government was obliged to come forth with additional evidence to sustain its burden of proving sanity beyond a reasonable doubt. Davis v. United States, 160 U.S. 469, 16 S. Ct. 353, 40 L.Ed. 499 (1895). We turn to an analysis of the government's evidence.

Dr. Harold B. Fain examined the appellant twice—once at the Federal Medical Center in Springfield, Missouri, for a period of twenty-five days shortly before the trial, and once during the trial for about twenty to thirty minutes. The longer study was primarily for determining competency to stand trial but from it he formed a conclusion as to Bly's mental capacity on July 9, 1971, the date of the robbery. Examinations for physical symptoms, an electroencephalogram, and a battery of other evaluative tests led to the conclusion that there was no organic brain disease, no active psychotic process, no indication of a severe thought disorder, an intelligence quotient well within normal range (a score of 100 on a test in which anything above 85 is within normal range), and a personality disorder manifested in instability and antisocial behavior. Following interviews with Bly, Dr. Fain's diagnosis was that he had a personality disorder, nonpsychotic, antisocial type with a history of drug dependence. An antisocial type of personality disorder relates to difficulty with parental and societal authority. In Dr. Fain's opinion Bly had the "ability to know right from wrong and could control his actions and conform them, if he so desired." Bly showed, according to Dr. Fain, no evidence during either period of examination of psychosis or thought disturbance; he had the ability to choose the right thing or the wrong thing and to carry out his choice. Bly, in the doctor's opinion, had the capacity to distinguish right from wrong, had sufficient mental capacity and reason to understand the nature and character of the

offense, had the capacity to know that it was a violation of the law to rob a bank, and had the ability to plan. Dr. Fain thought that planning was to be distinguished from an irresistible impulse and that not all bank robbers or criminals are insane.

The testimony of Dr. Fain directly contradicted that of Dr. Rosenberg. Its weight was for the trial judge as fact-finder. Additionally, the trial judge had before him the testimony of Dr. Judith L. Tharp, a physician who had had training in psychiatry. She examined Bly at the hospital on the day of and just following the robbery and made special effort to look for mental disorder. She found Bly's responses entirely appropriate and found nothing to cause her to think that Bly was insane. She testified that only the fact that Bly had apparently committed a bank robbery raised any question in her mind of his possible insanity. His behavior in her presence was restrained and cooperative; he answered simply and straightforwardly, although reluctant to expand any answers. This would lead her to believe that Bly was sane. There also was lay testimony which was proper for consideration. James F. Glonek, special agent with the F.B.I., spent about three hours with Bly immediately after the robbery. His testimony recited his conversations with Bly and Bly's reactions to Glonek's and medical personnel's questioning. Glonek testified that Bly exhibited nothing to cause Glonek to believe that Bly was mentally ill in any way.

 Bly's taking of numerous precautions before, during and after the robbery to avoid detection was justifiably considered by the trial judge in deciding the issue of insanity.

When all the evidence is considered, it must be concluded that a finding of sanity beyond a reasonable doubt was warranted, whether by the former or present standard of measuring insanity. Further proceedings in the case would serve no useful purpose. The conclusion of Dr. Rosenberg was specifically rejected by the finder of the facts, most pointedly because of the doctor's assertion that anyone who has a history of criminal activity is not mentally responsible. The application of a differing standard—the ALI test in place of the M'Naghten-irresistible impulse test—would have no conceivable effect upon the trial court's rejection of Dr. Rosenberg's opinion. Nor can we see that use of a different standard could be expected to make a material difference in the opinions of any of the doctors who testified. If this had been a jury trial, a different case would be presented, but in the posture of this matter, where we have the benefit of specific findings of the fact-finder, we conclude that the proceedings should now be ended.

Judgment affirmed.