663 F.2d 1004
 Mrs. Leo H. HAYS, as natural mother and next friend of
Thomas Lee Hays, Petitioner-Appellant,
v.
Al MURPHY, Warden, Oklahoma State Penitentiary, and The
Attorney General of the State of Oklahoma,
Respondents-Appellees.
 No. 81-2064.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 26, 1981.
 
 Charles Foster Cox and Clarence Kent Eldridge, Oklahoma City, Okl., for petitioner-appellant.
 David W. Lee, Asst. Atty. Gen. of Oklahoma, Oklahoma City, Okl. (Jan Eric Cartwright, Atty. Gen. of Oklahoma, Oklahoma City, Okl., was on the brief), for respondents-appellees.
 Before HOLLOWAY, LOGAN and SEYMOUR, Circuit Judges.
 HOLLOWAY, Circuit Judge.
 
 
 1
 This habeas action was begun in the District Court for the Eastern District of Oklahoma by Mrs. Leo H. Hays as natural mother and next friend of Thomas Lee Hays, a prisoner at the Oklahoma State Penitentiary. Mrs. Hays alleges that her son is incompetent and thus incapable of maintaining the proceedings himself or of protecting his own federal constitutional rights not to be subjected to an illegal sentence of death. Mrs. Hays attacks the validity of the conviction and death sentence imposed on her son on a charge of first degree murder by the District Court of Muskogee County, Oklahoma, and affirmed by the Oklahoma Court of Criminal Appeals. Hays v. Oklahoma, 617 P.2d 223 (Okl.Crim.App.). The respondent Warden and respondent Attorney General challenge the standing of Mrs. Hays to proceed as a next friend, arguing essentially that she has not demonstrated the incompetency of Thomas Lee Hays so as to justify a next friend proceeding.
 
 
 2
 After an evidentiary hearing the district court, 521 F.Supp. 1290, upheld the objection of respondents, finding that Thomas Lee Hays was competent under the applicable standard so that this next friend proceeding could not be maintained. The habeas suit was therefore dismissed. Mrs. Hays appeals, arguing that the limited observations of her son by physicians and others were wholly inadequate to serve as a basis for the determination of his mental competency and that, in any event, the evidence demonstrated the incompetence of her son so that the finding of competency was clearly erroneous.
 
 
 3
 From thorough study of the record we must agree with the first proposition asserted by the petitioner, Mrs. Hays. There was sufficient evidence that Mr. Hays may have a serious mental disease, disorder or defect, existing prior to commencement of this suit and during critical earlier times, so as to require careful evaluation and examination of him to determine his competency. The limited observations of him by experts and others, under the conditions where they were made, are shown overwhelmingly by the record to be insufficient under procedures recognized as essential for a determination of the critical question involved-the competency of Mr. Hays under the controlling standard. See Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583. Accordingly, we must reverse the judgment of dismissal and the findings and conclusions of the district court and remand the case for further proceedings.
 
 
 4
 * The principal facts pertinent to our disposition are as follows:
 
 
 5
 Thomas Lee Hays was convicted in the District Court of Muskogee County on a charge of first degree murder arising from a homicide in March 1977 in Muskogee. Circumstantial evidence tending to show that Mr. Hays committed the fatal shooting is detailed in the opinion of the Oklahoma court. See 617 P.2d at 226-27. Mr. Hays has maintained his innocence throughout, as he continues to do. He was found guilty, however, by a jury verdict and subjected to a death sentence after a penalty determination by the jury under the bifurcated procedure prescribed by Oklahoma statutes, now appearing as 21 O.S.Supp.1979, § 701.10 et seq.
 
 
 6
 On direct appeal to the Court of Criminal Appeals Mr. Hays asserted several claims of error including: erroneous admission of exhibits; erroneous denial of a motion for a mistrial after improper admission of lineup testimony; constitutional error arising from prejudicial and improper comments by the prosecutor on Mr. Hays's failure to testify; improper excusing of trial jurors who manifested a personal objection to the imposition of the death penalty; that there was insufficient proof of the required elements of felony murder; that the procedure by which the death penalty is reached in Oklahoma contravenes the Eighth Amendment in that it constitutes cruel and unusual punishment, and that the method of selecting the jury practically insured imposition of the death penalty; that the evidence failed to establish the aggravating circumstances of an "especially heinous, atrocious or cruel" murder, the creation of a great risk of death to more than one person, or the probability that the defendant would commit criminal acts of violence which would constitute a continuing threat to society.
 
 
 7
 After the affirmance of the conviction on direct appeal, Mr. Hays, according to his trial counsel, did not authorize an application for certiorari to the Supreme Court of the United States and none was filed. A hearing was held on May 19, 1981, by a state district judge, acting as a special referee appointed by the Court of Criminal Appeals. Mr. Hays was present and declined to respond when asked by the judge whether he had any statements to make. He remained mute when the judge inquired whether he wished to waive his right to appeal his conviction.[1] Based on Mr. Hays's lack of response, the special referee made a report in which he found that
 
 
 8
 the appellant has not affirmatively waived his right to appeal, he has not expressed, in open court, any particular desire with reference to appeal, and the Special Referee concludes as a matter of law that appellant does not waive any statutory or constitutional rights by his silence.
 
 
 9
 (VI R., Report of Special Referee filed May 20, 1981).
 
 
 10
 After this hearing the Attorney General applied to the Court of Criminal Appeals to set an execution date and that court set the date of September 14, 1981.
 
 
 11
 On August 19, 1981, Messrs. Cox and Eldridge, present counsel for the petitioner-appellant, and Mr. Louis Bullock[2] filed an application in the Oklahoma Court of Criminal Appeals for a stay of execution. An application for state post-conviction relief was also filed the same day by these attorneys in the District Court of Muskogee County. The Court of Criminal Appeals set a hearing on the matter for September 2, 1981, and ordered that Mr. Hays be brought to the hearing. At that time the Judges asked Mr. Hays questions in open court. In response he indicated that he did not want further legal proceedings on his behalf, that he did not want Messrs. Cox, Eldridge and Bullock to represent him, and that he understood that his execution date was set for September 14. When asked, however, whether he wanted his former retained counsel, Mr. Settle, to withdraw from the case, Mr. Hays made no comment. He also made no comment when asked whether he understood that he could have further proceedings if he desired.[3]
 
 
 12
 The Court of Criminal Appeals then entered an order on September 2 declining to stay the execution scheduled for September 14. The order recited the questions asked and the answers given by Mr. Hays. See note 3, supra. On consideration of testimony and exhibits presented and the transcript of the hearing on May 19, 1981, before the special referee, the court found that Mr. Hays had "affirmatively waived any further legal proceedings on his behalf and does not seek a stay of execution." The court further found that Mr. Hays was not represented by Messrs. Eldridge, Cox and Bullock, and that he did not wish them to represent him.[4] The order concluded with a denial of a stay of execution.
 
 
 13
 Two days later on September 4, this federal habeas suit was filed in the Eastern District of Oklahoma. The district judge immediately set a hearing for September 8. On that date an evidentiary hearing was held with the taking of testimony from witnesses for both sides, the introduction of extensive documentary evidence, and arguments by counsel. This evidence focused mainly on the competency issue in dispute. At this federal hearing, counsel for Mrs. Hays also offered to introduce evidence to establish the existence of substantial constitutional questions presented by this habeas suit concerning the original trial record "raising very significant federal questions ...." The district judge apparently agreed that substantial constitutional questions were presented, interposing that "(t)he Court gleans that from the petition." (VII R. 73).
 
 
 14
 The district court announced a ruling at the conclusion of the hearing on September 8. It found essentially that Mrs. Hays, as natural mother of Thomas Lee Hays, was a proper person to maintain this next friend proceeding, but that Mr. Hays had the capacity to appreciate his position and problem and made a rational choice with respect to continuing or abandoning further litigation at the September 2 hearing before the Court of Criminal Appeals. (VII R. 200-201). Written findings and conclusions followed. The court therein found Hays to have such competency at the present time and at least "through a period preceding September 2, 1981, and June 15, 1981 ...." (I R. 194). The habeas suit was dismissed for lack of jurisdiction due to the absence of a proper case or controversy.
 
 
 15
 The district court did, however, issue a stay of execution for 30 days to permit the prosecution of an appeal to this court. On consideration of the record, the docketing statement and the initial brief, on September 24, this court, on its own motion, determined that the stay should be extended until further order of the court due to the important nature of the proceeding and the serious consideration required by the issues presented. The appeal was expedited, briefs filed, and argument of the appeal on its merits was heard on October 2, 1981.
 
 II
 
 16
 As stated by the district court in its findings, (I R. 194), the serious question considered there was Mr. Hays's
 
 
 17
 mental competence in the present posture of things, that is, whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises.
 
 
 18
 Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583. We agree that we should apply this test for determining whether there is incompetency which may serve as the premise for this next friend proceeding for Hays "by someone acting in his behalf." See 28 U.S.C. § 2242.[5] The competency of Mr. Hays under this test, and the adequacy of procedures followed to evaluate his competency, are the critical issues before us. There is no challenge to the district court's ruling that Mrs. Hays, as the mother of Mr. Hays, has the proper relationship to maintain the action.
 
 
 19
 As indicated, we do not ground our disposition on the claim that the district court's finding of competency was clearly erroneous and do not reach that question. While the district judge gave an opportunity for a full hearing and the presentation of evidence available, the court was seriously disadvantaged by the lack of a proper background of evaluation of the competency issue by psychiatric and psychological experts, physical examinations and proper observations by those who testified. The district court's findings, which agreed with the conclusion of competency reached by some experts offered by the State, do not discuss the substance of the claim which we find controlling-that the examinations and evaluations of Mr. Hays were insufficient for a determination on the critical question of competency. (See I R. 5, 37, 67 and 71; VII R. 197; Brief of Mrs. Leo H. Hays at 5-6, 11, 24). Insofar as the district court may have found the procedures adequate we must disagree, and from the evidence as a whole we are impelled to the definite and firm conviction that a mistake was made. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129.[6]
 
 A.
 
 20
 As a crucial backdrop indicating the seriousness of this problem, we note that there was significant evidence raising questions as to the competence of Mr. Hays. There were several mental commitment proceedings over a period of years from 1967 through 1974. Despite some orders of restoration of competency, the recurring mental problem cannot be ignored.[7] There was evidence which is uncontradicted of suicidal tendencies,[8] lengthy alcoholism, and the possibility of a concussion.[9] Nevertheless there was no physical examination to determine whether there was an impairment as a result of any such injuries. There was also evidence of delusions which appeared in records from witnesses for the State.[10]
 
 
 21
 Moreover in January 1981 Dr. Edwards, a psychologist who testified for the State, diagnosed Hays as schizophrenic, paranoid type, and he was still willing to make a diagnosis of schizophrenia on August 17, 1981. (VII R. 82, 89). While he would not classify Hays in this way at the time of the September 8, 1981, hearing, Dr. Edwards's detailed notes of visits with Hays in late August and his testimony seriously undermine his opinion expressed at the hearing. The notes reveal disturbing observations about Hays in August and they also show that Dr. Edwards had only limited contacts with Hays after his one and a half hour meeting with him on August 17, when Hays was still viewed as schizophrenic.[11]
 
 
 22
 Dr. Ford, one psychiatrist who testified for the State at the habeas hearing on September 8, made a written report on July 7, 1981, concerning Hays to the Chief of Security of the Oklahoma Department of Corrections. (VIII R., Pl. Ex. 5). The letter states that Hays had refused to leave his cell for the infirmary, that Dr. Ford and a staff psychologist, James Fenwick, went to Hays's cell, and Hays refused to talk to them. Dr. Ford then asked a variety of questions and Hays "laughed, inappropriately." Dr. Ford learned from the Correctional Officer that Hays had been sleeping poorly and had been "bizarre and inappropriate in his behavior for several weeks. On reviewing Mr. Hayes' (sic) chart, it seems he has a history of paranoid schizophrenia dating back at least to 1978. He has had episodes throughout the period of the past four years of bizarre and possibly psychotic behavior." (Id.). Dr. Ford wrote that it was impossible, because of Hays's refusal to cooperate, to get a psychiatric assessment of his condition, "other than to state in general his behavior is inappropriate." (Id.). Dr. Ford's testimony at the federal habeas hearing on September 8 was to the same effect. Dr. Ford also testified that he was unable to establish rapport with Hays in August, as was the case earlier, which was unusual for Dr. Ford. (VII R. 128-30, 132, 134).
 
 
 23
 In May 1981 the State itself applied to the Court of Criminal Appeals for commitment for a mental examination of Hays. The application was withdrawn a few days later without such a commitment. (VI R. Response of the State to Report of the Special Referee).
 
 
 24
 After reviewing the evidence noted above, as well as the remainder of the record before us, we must conclude that serious questions were clearly raised concerning the competence of Mr. Hays.
 
 B.
 
 25
 We now turn from the evidence showing that Mr. Hays may have a serious mental disease, defect or disorder to the evidence concerning the proper evaluations required to make a determination on his competency.
 
 
 26
 We are convinced that the evidence overwhelmingly establishes that there was not sufficient opportunity for proper psychiatric and psychological evaluation of Mr. Hays. There was sporadic interviewing of him through the long period that he has been in custody on death row at the Oklahoma State Penitentiary and several psychiatrists and psychologists have had contacts with him at different times. Nevertheless, the testimony convincingly demonstrates that proper evaluation requires a setting and a relationship between the subject and the experts which were not permitted by the circumstances of death row imprisonment. This is illustrated by the fact that the State relies heavily on the one 30-minute interview of Hays on death row by four staff members, and their consensus opinion therefrom. This, we conclude, was clearly inadequate to serve as a basis for such a serious determination.[12] And although the various contacts of the witnesses with Mr. Hays did occur over a long period of time, none of the testimony from the witnesses revealed the type of extended, close observation in a proper setting which is generally recognized as essential for the psychiatric and psychological evaluations required.[13]
 
 
 27
 Furthermore we note that there was an absence of psychological tests and evaluations which are generally utilized for such a critical determination. Dr. Edwards, the psychologist testifying for the State who recited the most contacts with Hays, testified that he gave no psychological tests to him. (VII R. 98). Our record makes no reference to any psychological tests being administered. These include personality inventories, intelligence tests, and recognized projective tests.[14]
 
 
 28
 The testimony of the expert witnesses for Mrs. Hays impressively outlined the need for further careful evaluations, particularly the testimony of a psychiatrist with a significant background in the study of defendants in criminal cases.[15] Moreover, there was no direct contradiction of this testimony, except for disagreement on the need for an EEG. Indeed, the testimony of two of the expert witnesses for the State demonstrates the inadequacy of the brief July 10, 1981, interview, relied on heavily by the State. In sum, the record as a whole clearly establishes the compelling need for further evaluations.[16]
 
 III
 
 29
 We conclude that before any ruling is made which would determine Mr. Hays's competency, further physical examinations and mental evaluations must be made, and remand for this purpose.[17] See Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583; Suggs v. LaVallee, 570 F.2d 1092, 1109-1112 (2d Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263; cf. Jones v. United States, 327 F.2d 867, 874-75 (D.C.Cir.) (en banc); and id. at 879-80 (Wright, J., concurring in the result). Such procedures are critically important here because of "the obviously irreversible nature of the death penalty." Evans v. Bennett, 440 U.S. 1301, 1306, 99 S.Ct. 1481, 1484, 59 L.Ed.2d 756 (Opinion in Chambers of Justice Rehnquist). We do not attempt to prescribe the particular tests and evaluations to be carried out. These should be specified, or authorized for the experts to carry out, by the district judge after he receives the views of experts for the petitioner, the State, and any additional experts whom the district judge may appoint, based on the facts and circumstances which Mr. Hays's case presents.[18]
 
 
 30
 Accordingly the judgment, findings and conclusions of the district court are reversed and the cause is remanded for further proceedings in accord with this opinion. The district court will hold hearings permitting the parties to present the expert information necessary for the court to prescribe or authorize the examinations and evaluations to be undertaken and the appropriate commitment to be made to state or federal hospital facilities, under conditions indicated by information from the experts.[19] After such examinations and evaluations by a reasonable number of experts designated by the petitioner, the State, and any appointed independently by the district court, and hearing the testimony of such experts thereon and other witnesses, the court should make findings and conclusions pertinent to the competency issue and the maintenance of this action by Mrs. Hays as petitioner, and any further issues reached by the court.
 
 
 31
 It is further ordered that the September 24, 1981, stay and injunctive order of this court, restraining the respondent Warden and all other persons acting under the authority of the State of Oklahoma from carrying out of the execution of Thomas Lee Hays, is continued and will remain in effect through such further proceedings in the district court and the entry of the new findings, conclusions and judgment and until an order thereafter is entered by that court on the question of a stay.
 
 
 32
 IT IS SO ORDERED.
 
 
 
 [1]
 The questions and answers before the special referee were as follows:
 THE COURT: He is aware-he is aware of what we're here for this afternoon?
 MR. SETTLE: I explained to him the purposes of the hearing this morning, both today and I explained to him when I saw him on May 15th at the Oklahoma State Penitentiary.
 THE COURT: Would you like to make any statement, Mr. Hays?
 MR. HAYS: (Shakes head.)
 THE COURT: Mr. Lee, can you advise me what issue we have here?
 MR. LEE: First, I would like the Court to make a statement to the record as to what Mr. Hays' response was.
 THE COURT: All right. I'll simply suggest for the record that I inquired of Mr. Hays whether he wished to make any statement and he simply shook his head "No". Is that fair?
 MR. LEE: I would like the Court to inquire of the Defendant, Mr. Hays, whether or not-rather than the Court merely inquiring whether he has anything to say, whether or not that the-what his attorney has stated in the response are his desires.
 THE COURT: Well, I don't-I don't think I want to put it that way, Mr. Lee. I'll ask Mr. Hays whether you wish to waive your right to appeal, and of course, I'll advise you, Mr. Hays, I'm sure your attorney will and I will give you time, if you wish, to talk to your attorney. I'm not trying to hurry you in any way. But I am not going to let you-I'm not going to determine that you have waived your right to appeal by silence. If you wish to waive your right to appeal, you must do it affirmatively. Do you understand what I'm asking?
 DEFENDANT HAYS: (No response.)
 THE COURT: Let the record show that the Appellant, Mr. Hays, remains silent and the Court assumes from that that he is not waiving his right to appeal, and obviously, if he's going to exercise his right to appeal, he is not requesting an early execution date.
 (V R. 11-14).
 
 
 [2]
 Mr. Louis Bullock of Tulsa, Oklahoma, appeared with Messrs. Cox and Eldridge on behalf of Mrs. Hays in previous proceedings and in the habeas hearing on September 8, but is not appearing in this appeal
 
 
 [3]
 The questions and answers before the Oklahoma Court of Criminal Appeals were as follows:
 JUDGE BRETT: ... Mr. Hays, would you please stand up, I have four questions I would like to propound to you.
 Do you want any further legal proceedings in your behalf?
 MR. HAYS: No.
 JUDGE BRETT: Do you want these lawyers, that are sitting here, to represent you?
 MR. HAYS: No.
 JUDGE BRETT: Now, you understand, that your execution date is set for September 14?
 MR. HAYS: Yes.
 JUDGE BRETT: And you understand that unless you state that you wish the appeal to go further that that execution date will probably materialize?
 MR. HAYS: Yes.
 JUDGE CORNISH: Mr. Hays, do you wish that Mr. Settle withdraw from the case, from any further representation of you?
 MR. HAYS: No comment.
 JUDGE BUSSEY: Mr. Hays, you do understand that there is a post-conviction remedy available to you and if you elect to have that instituted by any party you're entitled to do so under State Laws; do you understand that?
 MR. HAYS: I didn't hear you.
 JUDGE BUSSEY: Do you understand that you can have further proceedings if you desire to do so; do you understand that?
 MR. HAYS: No comment.
 JUDGE BUSSEY: No questions.
 (IV R. 25-26).
 On the afternoon of September 1, 1981, the day before this hearing before the Court of Criminal Appeals, Dr. Kenneth Anthony Edwards, a staff psychologist, visited Hays and his notes indicate that Hays had been given a shave, that he was to receive a haircut that night and that he was aware of his hearing scheduled for the next day. Dr. Edwards heard caseworker James Sorrels try to get Hays to promise he would answer questions. Hays never said whether he would or not. VIII R. ex. 6 (notes of Dr. Edwards).
 At the federal habeas hearing Sorrels testified that he did not comment to Hays on whether he had a good appeal, that he had not urged him to continue his case, but that he did urge Hays to tell the court "either yes or no." VII R. 172.
 
 
 [4]
 Respondents-Appellees' brief argues that under 28 U.S.C. § 2254(d) factual determinations of a state court are presumed correct. (See Brief of Appellees at 18-19). This statutory presumption does not, however, strengthen the State's position on the questions before us. Our holding is limited to the inadequate procedures used to determine Mr. Hays's competence, and the record shows that the Oklahoma court made no findings on this issue. The Court of Criminal Appeals found:
 that Thomas Lee Hays has affirmatively waived any further legal proceedings on his behalf and does not seek a stay of execution.
 THIS COURT FURTHER FINDS that Thomas Lee Hays is not represented by attorneys Eldridge, Cox and Bullock, nor does he wish them to represent him.
 (See VI R., Order Declining to Issue Stay of Execution).
 After some evidence and comments concerning competence were presented to it, the Court of Criminal Appeals ruled that such evidence was irrelevant to the proceedings before it. (See IV R. 17; see also IV R. 24, 28). Thus, the state court actually did not make a competency finding, or a finding on the sufficiency of the evaluations of Mr. Hays's competence.
 In any event, the facts on which we ground our disposition-the shortcomings of the evaluations of Mr. Hays's competency-were not developed at the state court hearings. Thus, on this issue which is material before us, such findings would not carry a presumption of correctness. See 28 U.S.C. § 2254(d)(3); Suggs v. LaVallee, 570 F.2d 1092, 1113-15 (2d Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263.
 
 
 [5]
 The parties are agreed this is the applicable test. (See Brief of Mrs. Leo H. Hays, at 4; Brief of Appellees, at 14)
 
 
 [6]
 The District Court's findings of competency are based mainly on the report of a 30-minute interview on July 10, 1981, by four staff members with Hays and testimony by one of these four staff members, Dr. Edwards, the chief psychologist at the penitentiary. For reasons which we detail later, the record shows that none of these opinions was based on an adequate evaluation of Hays. See notes 11 and 12, infra, and accompanying text
 The court's findings also advert to the lay testimony by Hays's caseworker, James Sorrels. While such testimony may furnish competent background evidence, the opinion offered by this layman is also flawed because of the circumstances under which his observations were made. (VII R. 158-161).
 
 
 [7]
 On August 21, 1967, a petition was filed by Mr. Hays's father which sought to have the court order the admission of Mr. Hays to a hospital. The petition was "held in abeyance pending good behavior." In June 1970 a petition was filed by both of Mr. Hays's parents which sought to have the court order the admission of Mr. Hays to a hospital. The record does not disclose the disposition of this proceeding for commitment. On October 28, 1974, Mr. Hays was admitted to the state mental hospital at Vinita, Oklahoma. On December 6, 1974, Mr. Hays was discharged therefrom, the discharge reciting that his competency was restored. Eleven days later on December 17, 1974, Mr. Hays was again ordered admitted to the state hospital at Vinita. On July 10, 1975, Mr. Hays was released, the discharge again reciting restoration of competency. (See VIII R., Petitioner's exhibits 1-4)
 
 
 [8]
 Dr. William R. Ford, one of the psychiatrists who testified for the State at the September 8 habeas hearing, stated that shortly after Mr. Hays was admitted to death row "he was suicidal on several occasions and ... (o)n one occasion he did cut his wrist." (VII R. 132). Dr. R. D. Garcia, also a State psychiatric witness, testified that in February 1978 it was reported to him that "at times (Hays) was extremely suicidal." (VII R. 118)
 
 
 [9]
 For evidence as to lengthy alcoholism, see I R. 56, VII R. 17, 98-99 and 150. For evidence as to a possible concussion, see VII R. 44
 
 
 [10]
 The record discloses numerous occasions where Hays expressed himself in a bizarre manner. See e. g., VII R. 81, 113; VIII R. Petitioner's exhibit 6 (Dr. Edwards's notes). Two of the State's experts diagnosed some of this expression as instances of delusion
 Delusion is a symptom that indicates a serious loss of contact with reality. "The presence of delusions provides strong presumptive evidence for schizophrenia ... if those delusions have ... bizarre content." H. Kaplan, A. Freedman, B. Sadock, A Comprehensive Textbook of Psychiatry/III, at 1178 (3d ed. 1980) (hereinafter cited as Kaplan and Freedman).
 Dr. Garcia, a psychiatrist, testified at the September 8 habeas hearing that "there was delusion of persecution and symptoms of suspiciousness; that's what I would call delusion of persecution which was obvious here because he claims that he was going to be killed." (VII R. 125). Dr. Edwards, also testifying at the September 8 hearing, stated that Hays's statement "I am God" was a delusion. (VII R. 112).
 Dr. Hans von Brauchitsch, a psychiatrist experienced in evaluating the competency of defendants in criminal cases, (see note 15, infra ), testified for petitioner on the effect of delusions on Mr. Hays (VII R. 61):
 I think there is areasonable (sic) medical evidence that Mr. Hays has been suffering and is still suffering from a mental illness that is known to impair the ability of a sick person to appreciate reality and to exercise sound judgment, to the point where in certain areas his judgment may be based entirely on irrational delusion which the patient himself cannot perceive and over which he has no control.
 
 
 [11]
 See VII R. 90, 112 and 114; VIII R., Petitioner's exhibit 6 (Dr. Edwards's notes). Although at the September 8 hearing Dr. Edwards testified that he believed Hays thought his execution would be carried out (VII R.94), Dr. Edwards's notes from his August 22, 1981 observation of Hays state that "(i)n my opinion, Sunny (Hays) does not seem to understand that he is going to die." (Emphasis in original). Dr. Edwards also testified that Hays had said something in January 1981 and in August 1981 to the effect that he did not believe he was going to die or did not believe in death. (VII R. 113)
 
 
 [12]
 Both of the petitioner's experts, Dr. von Brauchitsch and Dr. Delmar Ozolins, testified that the competency evaluations conducted by the State's experts were inadequate, including specifically the brief interview on July 10, 1981, by Dr. Cleve Beller, Chief Staff Physician, Oklahoma State Penitentiary; Dr. William Baker, Staff Psychiatrist, Joseph Harp Correctional Center; Dr. William Knoflicek, Staff Psychologist, Joseph Harp Correctional Center; and Dr. Edwards, Chief Psychologist, Oklahoma State Penitentiary. (VII R. 35-37, 51)
 In a letter from Dr. Beller to Dr. Armond Start, Medical Director, Department of Corrections, Dr. Beller disclosed the "consensus opinion" the four doctors arrived at after the July 10 interview:
 I. Thomas Lee Hayes (sic) was alert, and not under the influence of mind altering drugs, nor did he exhibit evidence of toxicity from any organic cause.
 II. Thomas Lee Hayes (sic) was not psychotic.
 III. Thomas Lee Hayes (sic) was competent to make decisions in his behalf, and to understand the consequences of his decisions.
 (I R. 184).
 The federal district court relied heavily on these critical conclusions and viewed them as "particularly probative." I R. 193. These conclusions were arrived at, however, following an interview lasting approximately 30 minutes. Dr. Baker testified that 30 minutes was "certainly the outside limit." (VII R. at 140).
 The likelihood that this meeting, because of its brevity, was inadequate to determine such a substantial issue is further compounded by the fact that Dr. Edwards was the only one of the four doctors who had ever seen Hays before, and thus was likely the only one with a realistic opportunity to establish an adequate relationship over a sufficient period of time to determine if any of Hays's actions were manifestations of schizophrenia. See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 188-90 (1980) (hereinafter cited as DSM/III); L. Bellak, L. Loeb, The Schizophrenic Syndrome, 337-38 (1969) (hereinafter cited as Bellak and Loeb ); S. Arieti, Interpretation of Schizophrenia, 51-62 (1974).
 Moreover, the substance of the questions asked of Hays during the interview casts doubt on the adequacy of the evaluation for such a critical determination. Except for brief questioning as to Hays's choice not to pursue the appeal process, only "general" questions were asked of him. (VII R. 139, 148, 149). According to Dr. Edwards, the interview addressed "the time of day, and 'How are you?' kind of things." (VII R. 84). The record indicates that during the interview only superficial inquiry was made into Hays's health history and none into numerous other areas that are standard in the diagnosis of schizophrenia. VII R. 51, 148; see, e. g., Kaplan and Freedman, 1178-1180 and 1187.
 We are also concerned that the atmosphere on death row where the interview occurred did not provide a clinical setting conducive to an accurate determination in such an inquiry. Dr. Baker stated "(t)he atmosphere in that place (death row) is such that I can well understand why somebody would despair of living," and Dr. Beller said "it was quite noisy and we would get close in order to ask the man questions and to hear his responses." (VII R. 140, 149) (Emphasis added).
 
 
 [13]
 We note that in the evaluation of competency in the analogous field of whether a criminal defendant is competent to stand trial, commitments are made for extended periods in hospital facilities for periods of 60 days and more in numerous instances. See, e. g., Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84; United States v. Taylor, 510 F.2d 1283 (D.C.Cir.); United States v. Alexander, 471 F.2d 923 (D.C.Cir.), cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494; United States v. Bennett, 460 F.2d 872 (D.C.Cir.); Thornton v. Corcoran, 407 F.2d 695 (D.C.Cir.); Jones v. United States, 327 F.2d 867, 879 (D.C.Cir.) (Wright, J., concurring in the result) (St. Elizabeth's Hospital prefers 90-day commitment for a psychiatric evaluation); Powell v. United States, 373 F.2d 225 (D.C.Cir.); Henderson v. United States, 360 F.2d 514 (D.C.Cir.); Timmons v. Peyton, 360 F.2d 327 (4th Cir.), cert. denied, 385 U.S. 960, 87 S.Ct. 396, 17 L.Ed.2d 305. Manifestations of schizophrenia "are present one day and not the next. They are revealed to one examiner and not to another .... A complete account of a patient's symptomatology, therefore, demands that he be observed over an extended period of time." Bellak and Loeb, 337-38
 
 
 [14]
 "In most clinical centers certain psychological test batteries are routinely used to indicate, confirm, or rule out a diagnosis of schizophrenia." Kaplan and Freedman at 1184. Numerous cases have recognized the importance of evaluation by the Rorschach Test, the Wechsler Adult Intelligence Scale, and the Minnesota Multiphasic Personality Inventory. See, e. g., United States v. Davila-Nater, 474 F.2d 270 (5th Cir.); United States v. Alexander, 471 F.2d 923 (D.C.Cir.), cert. denied, 409 U.S. 1044, 93 S.Ct. 541, 34 L.Ed.2d 494; Blunt v. United States, 389 F.2d 545 (D.C.Cir.); Caudill v. Peyton, 368 F.2d 563 (4th Cir.); Timmons v. Peyton, 360 F.2d 327 (4th Cir.); United States v. Day, 353 F.2d 123 (6th Cir.). "Psychological testing ordinarily supplements (the social, environmental, physical and mental factors investigated)." Jones v. United States, 327 F.2d 867, 879 (D.C. Cir.) (Wright, J., concurring in the result). The enumeration above of some standard testing procedures is illustrative only, and not intended to limit those tests which may be considered advisable in this case. There are others, see e. g., Kaplan and Freedman, 1184-85, and the experts will have an opportunity to express their views on the advisability of additional testing procedures or observations. See Part III infra
 The need for an electroencephalogram has also been recognized in some instances. E. g., United States v. Hollis, 569 F.2d 199 (3rd Cir.); United States v. Hartfield, 513 F.2d 254 (9th Cir.); United States v. Davila-Nater, 474 F.2d 270 (5th Cir.); United States v. Bly, 464 F.2d 1235 (8th Cir.); Evans v. LaVallee, 446 F.2d 782 (2d Cir.), cert. denied, 404 U.S. 1020, 92 S.Ct. 691, 30 L.Ed.2d 668.
 
 
 [15]
 Dr. von Brauchitsch, a psychiatrist from the University of Oklahoma medical school staff, has been officially appointed to evaluate for competency in criminal cases in the State of Michigan. He has evaluated a considerable number of competency cases and still assists in such work. (See VII R. at 46-49). When asked how he approaches the issue of competency he stated:
 (F)irst of all, you have to evaluate the physical aspects of the client or the inmate to see if he might be suffering from a physical illness that could cause mental symptoms, and if a patient has had any kind of a history of head injury, concussion, blackout spells, rage attacks, headaches or needs some very thorough physical work-up I would have to include at least an electroencephalogram, x-rays, using brain scan, of course a complete physical neurological examination. This is a minimum.
 Frequently I have gone beyond that by ordering specific neuropsychiatric tests; and of course I try to establish as good a relationship with a patient as possible, and talk.
 Now this is only part of the examination.
 (VII R. 48-49).
 Dr. von Brauchitsch concluded that he "would recommend that Mr. Hays undergo appropriate physical, mental and psychological examination." (VII R. 61). This recommendation is supported by recent scientific authority. The textbook of Kaplan and Freedman, states at 1179, that
 the diagnosis of schizophrenia cannot be made entirely on the basis of observation, logical reasoning, or objective measurement. It still requires a careful and comprehensive clinical evaluation. Such an evaluation must take into account the presence or absence of certain schizophrenic key symptoms, the patient's prepsychotic personality, the physical findings, the family genetic history, the social environment, the various aspects a good clinical anamnesis may reveal about the natural history of the disease, and any possible precipitating factors.
 
 
 [16]
 Dr. Ford and Dr. Baker were psychiatrists who testified for the State as to Hays's competency in 1981. Dr. Ford said that he did not have enough evidence on which to "base a diagnosis" because of Hays's refusal to converse with him as discussed earlier. (VII R. 132)
 The testimony of Dr. Baker was also inconclusive. He testified about the visit with Hays on July 10, 1981, saying it was a "brief conversation" and that 30 minutes was the "outside limit" of the interview by the four staff members with Hays. (VII R. 140). He was asked if he was able to form an opinion as to Hays's competency on the basis of his interview with Hays, and replied (id. at 141):
 I think, I think not, up to that point. At that point I think I didn't have enough information. I didn't have information to disagree with Dr. Beller and Dr. Edwards, because I saw no evidence that day of severe mental illness, and his given reason for wanting not to appeal the case didn't seem inappropriate to me. (Emphasis added).
 He was then asked about the value of an EEG and in replying said an examination as to competency doesn't normally require an EEG; that Hays seemed to understand where he was and what his situation was and the consequences of refusing an appeal; that you could find a lot of people with abnormal EEG's who are competent; and that he thought an EEG was not helpful here. (Id.).
 
 
 [17]
 In this connection petitioner-appellant has argued that the Supreme Court has taken extreme precautions in cases where there was less evidence in the record of the possibility of incompetence. See Transcript of Oral Argument at p. 3. We must agree. See Lenhard v. Wolff, 443 U.S. 1306, 100 S.Ct. 3, 61 L.Ed.2d 885 (Opinion in Chambers of Justice Rehnquist); Evans v. Bennett, 440 U.S. 1301, 99 S.Ct. 1481, 59 L.Ed.2d 756 (Opinion in Chambers of Justice Rehnquist); and Gilmore v. Utah, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632. In these cases there was less evidence indicating incompetence than in the case before us
 
 
 [18]
 We note the procedure followed in this respect in Suggs v. LaVallee, 570 F.2d 1092 (2nd Cir.), cert. denied, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263, affirming, 430 F.Supp. 877. The district court there did appoint an independent psychiatric expert. See 570 F.2d at 1110
 
 
 [19]
 In Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583, the Supreme Court, in an analogous situation involving a state prisoner, stated it would be appropriate to subject Rees to temporary federal hospitalization so far as necessary for psychiatric and other appropriate medical examinations. We do not read the opinion as requiring commitment to a federal hospital if the district court is satisfied from the expert and other testimony that commitment to a state hospital will be suitable for the necessary examinations and evaluations